*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0374p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

OHIO REPUBLICAN PARTY; LARRY WOLPERT,
　　　　　　　　　　　*Plaintiffs-Appellees,*

　　*v.*

No. 08-4322

JENNIFER BRUNNER, Secretary of State of Ohio,
　　　　　　　　　　　*Defendant-Appellant.*

Filed: October 14, 2008

Before: BOGGS, Chief Circuit Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.

_____

**ORDER**

_____

A majority of the Judges of the Court in regular active service have voted to hear this case *en banc*, thus vacating the stay of the Temporary Restraining Order, and to deny the motion of the Appellant Secretary of State to vacate or stay the district court's TRO.

Attached to this order are the opinions of SUTTON, Circuit Judge, joined by Chief Circuit Judge BOGGS and BATCHELDER, GILMAN, GIBBONS, COOK, McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges, concurring with the order; the separate writing of BATCHELDER, Circuit Judge; the opinion of GIBBONS, Circuit Judge, joined by BOGGS, Chief Circuit Judge, and BATCHELDER, GILMAN, SUTTON, COOK, McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges, concurring with the order; the statement of ROGERS, Circuit Judge, concurring with the order; and the opinion of KETHLEDGE, Circuit Judge, joined by GIBBONS and SUTTON, Circuit Judges, concurring with the order. Also attached is the opinion of MOORE, Circuit Judge, joined by MARTIN, DAUGHTREY, COLE, and CLAY, Circuit Judges, dissenting from the order; the opinion of MARTIN, Circuit Judge, joined by DAUGHTREY, COLE, and CLAY, Circuit Judges, dissenting from the order; and the opinion of WHITE, Circuit Judge, joined by DAUGHTREY and COLE, Circuit Judges, dissenting from the order. Not all judges have been able to respond, or to prepare additional separate writings and, should there be any such revisions or additional writings, this order will be re-issued with all separate writings appended thereto.

1

SUTTON, Circuit Judge, joined by Chief Judge BOGGS and Judges BATCHELDER, GILMAN, GIBBONS, COOK, McKEAGUE, GRIFFIN and KETHLEDGE. As this case comes (rapidly) to the court, the parties share some common ground. No one disputes that federal law, as described in the Help America Vote Act ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666 (2002) (codified at 42 U.S.C. § 15301 *et seq.*), helps Americans cast votes and helps to ensure that their votes count in two distinct respects. In one respect, the Act makes it easier for individuals to cast ballots by establishing a vote-first-challenge-later approach to dealing with disputes about an individual's eligibility to vote, the most obvious feature of which is the right to cast a provisional ballot when an election official questions an individual's eligibility to vote. In another respect, the Act helps to ensure that those votes count, or to put it another way the Act helps to ensure that those votes are not diluted by guarding against voter fraud. The one goal complements the other: Enabling the casting of one vote does little good if another voter fraudulently cancels it out. *See Crawford v. Marion County Election Bd.*, __ U.S. __, 128 S. Ct. 1610, 1619 (2008) (plurality opinion); *id.* at 1627 (Scalia, J., concurring in the judgment); *Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (per curiam); *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir. 1950).

No one disputes that one of the tools that HAVA creates to address fraud is found in 42 U.S.C. §15483(a)(5)(B)(i). It says:

> (5) Verification of voter registration information
>
> . . .
> (B) Requirements for State officials.
> (i)   Sharing information in databases.
> The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

No one disputes that this provision places mandatory duties on the Secretary of State. At a minimum, it requires the Secretary of State, together with the head of Ohio's Bureau of Motor Vehicles ("BMV"), to agree to "match" information in BMV's database with information in the Statewide Voter Registration Database ("SWVRD"). No one disputes that the purpose of this matching is "to enable [officials] to verify the accuracy of the information provided on applications for voter registration." *Id.*

And no one disputes that the Secretary of State has put together an SWVRD System Manual, which is designed to implement these obligations. The pertinent section of that manual says the following:

> 15.4.  BMV Not Confirmed (this process is currently turned off)
>
> Upon receipt of a voter registration record or update, the [Secretary of State] SWVRD will validate certain voter information with the BMV. If the [Secretary] and BMV validation is unable to match the voter record, it may not be confirmed. If this occurs the [Secretary] SWVRD sends the [county boards of election] a message stating that the record may not be "confirmed." Voter records that are not confirmed **must** have their information updated and resent to the [Secretary] SWVRD and validation with the BMV will be reattempted.

Resp. to Emergency Mot., Ex. 1 at 35 (Ex. A. to Damschroder Aff.) (emphasis in original). According to the Secretary of State's manual, that office at one point implemented §15483(a)(5)(B)(i) in this way: first, if there was not a match between the Secretary's and BMV's records, the Secretary would send the county boards of elections a message indicating that the voter's registration record cannot be "confirmed"; second, after that happened, the Secretary required unconfirmed voter records to be updated and resent to the Secretary for another effort to validate them with the BMV records. *Id.*; *cf. id.*, Ex. 1 at 63–64 (Kindred Aff.) (explaining the Secretary's earlier practice of sharing mismatch data with county boards).

The apparent "turn[ing] off" of this voter-registration-verification process, or at least the discovery that it had been turned off, prompted this dispute. For reasons that the record does not reveal and at a time the record does not reveal, the Secretary of State apparently chose to deactivate at least part of the process, if not all of the process, described in section 15.4 of her manual. In particular, she concedes that at some point she stopped communicating with the county boards about mismatches and stopped renewing validation requests with the BMV after obtaining a mismatch. The Ohio Republican Party ("ORP") and Larry Wolpert, a state representative, supported by affidavits from two officials of different county boards of election, challenge the Secretary's interpretation of her duties under HAVA. As they see it, §15483(a)(5)(B)(i) requires the Secretary to do what she formerly did under section 15.4 of her manual or at least requires her to share county-by-county records of mismatches with the local boards of election. If the statute requires the Secretary only to identify mismatches but does not require her to share this information in a meaningful way with the county boards, they add, then the purpose of verifying voter records with driver's license records would be defeated, and one of HAVA's tools for ferreting out voter fraud would become an empty gesture. The Secretary responds that the county boards of election technically still have "access" to this information because they have access to the SWVRD, which permits them to check each absentee voter (or any other type of voter) for mismatches. But, in contrast to being given a list of mismatches by county or having the Secretary assist them in addressing mismatch problems, the plaintiffs say that general access to the SWVRD system is essentially useless—not unlike asking for a drink of water and being given access to a fire hose at full volume—and will do nothing to address the anti-fraud objective of this provision of HAVA.

This dispute and several others apparently grew out of the Secretary's August order to allow simultaneous registration and voting for six days in Ohio in late September and early October. In resolving today's dispute, the district court on October 10, 2008, entered a temporary restraining order ("TRO") directing the Secretary to ensure that "HAVA's matching requirements are not rendered meaningless" and to do so either by providing lists of mismatches to the county boards of elections or by providing the county boards of election with a method to search the SWVRD so that they "can isolate and review the mismatches and take appropriate action." ROA 700.

A panel of this court vacated the order later that same day—October 10. While I tend to agree with some aspects of the panel's decision and sympathize with the lack of time it had to address these issues (12 hours or so), I disagree with its key premises for vacating the district court's TRO.

Before addressing those issues, it is important to point out why en banc review of the panel's decision is appropriate in this matter. While in the normal course it often will be unwise and inefficient to grant en banc review of decisions like this one, this is not a normal case—as the panel's interlocutory reversal of the district court's TRO itself establishes. Section 1292(a)(1) does not give courts of appeals authority to review temporary restraining orders but only "injunctions." 28 U.S.C. §1292(a)(1). We have correctly construed that authority to extend to TROs in limited cases, namely when a TRO effectively operates as a litigation-altering and litigation-ending injunction because it gives the parties no "meaningful appellate options" about a significant issue of law given the imminence of an irreversible event—say an execution, *see, e.g.*, *Workman v.*

*Bredesen*, 486 F.3d 896, 904 (6th Cir. 2007), or as here an election. *Cf. generally Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981). The same considerations that justify the panel's decision to review this TRO—the imminence of a national election and the significance of the issues presented—provide ample justifications for the en banc court to consider doing the same.

There are three problems with the Secretary's request to stay the district court's TRO. In the first place, her interpretation of §15483(a)(5)(B)(i) is not convincing. The key likelihood-of-success inquiry is this: does the provision permit the Secretary only to identify matches on the database (and effectively keep them to herself or, as plaintiffs put it, "throw them in the trash," Resp. to Emergency Mot. at 12), or does it require her also to verify the registration mismatches either by doing the verification herself or in cooperation with the county boards of election? So far as this record is concerned, the Secretary has given no tenable explanation why her current interpretation of the statute, as opposed to the office's prior implementation of the law, remotely furthers the anti-fraud objective of the law. A mismatch that she does not track down and that she does not allow the county boards of election meaningfully to track down is not a usable mismatch. When the Secretary argues in her papers that she has no duty to provide the most "user-friendly" system of HAVA compliance, Emergency Mot. at 17, that is something of a euphemism. As far as we can tell, the problem with the current system is not that it is insufficiently user-friendly but that it is effectively useless.

But there is another problem with the Secretary's interpretation: It straddles the two competing interpretive options presented by the provision rather than embracing one interpretation or the other. The most ruthlessly literal interpretation of the provision is this: the law requires the Secretary and the BMV only to enter into an agreement to match information in their databases and, once they have done that, they have satisfied HAVA's obligations—meaning that, other than the duty to share their data with each other, they have no duty to share mismatches with anyone else, to provide access to data showing the mismatches to anyone else or to investigate mismatches. The other interpretation of the provision is this: in addition to creating the two databases and in addition to identifying mismatches between them, the Secretary must "verify the accuracy of the information provided on applications for voter registration," 42 U.S.C. § 15483(a)(5)(B)(i), by correcting mismatches either at the Secretary's level or at the county board's level in order to ensure that the "voter registration records in the State are accurate and are updated regularly" and in order to ensure that the State's "system of file maintenance . . . makes a reasonable effort to remove registrants who are ineligible to vote," *id.* § 15483(a)(4)(A). The former interpretation does not require the Secretary to provide "access" to mismatch data contained in the system; only the latter interpretation does.

The Secretary picks neither option by itself. She adopts option one in the main but then borrows from option two by conceding that she must provide "access" to the data containing evidence of mismatches. Only then does she draw a line found nowhere in the statute—that the county boards must be given access; they just need not be given meaningful access. Call that interpretation what you will, but it is hardly a construction of the law mandated by its "plain language." In picking option two, the district court embraced a sensible and coherent interpretation of these provisions, one sufficiently likely to succeed that it deserves our respect.

Contrary to the dissent's and amici's interpretation, *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006), and *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), offer no support for a contrary interpretation. These cases deal with whether HAVA preempts state laws that *require* successful matching before a would-be voter can *register* to vote. *Reed* and *Browning* are thus two steps removed from today's case: (1) We are not dealing with any precondition on voter registration, and (2) no one is arguing that a successful match is a necessary precondition to anything. Put simply, neither case addressed, in holding or dicta, the issue presented here: namely, whether § 15483(a)(5)(B)(i), together with other provisions of

HAVA, require the Secretary to provide local election officials with meaningful access to mismatches identified in the SWVRD. No decision on that issue, one way or the other, can fairly be said to "create[] a circuit split," Dissent at 20, for the simple reason that no other court of appeals has addressed the issue.

Nor, it bears emphasizing, is anyone arguing that a mismatch necessarily requires that a registered voter be removed from the rolls. At most, the identification of a mismatch allows a county board to investigate whether the mismatch has a legitimate explanation (say, a recent change of address). *See* Ohio Rev. Code Ann. § 3509.06(D) (requiring election officials, before counting an absentee ballot, to "verify that the absent voter's ballot is eligible to be counted under section 3509.07 of the Revised Code"); *id.* § 3509.07 (providing that an absentee ballot "shall not be accepted or counted," if "election officials find that," among other things, "the applicant is not a qualified elector in the precinct"). Nothing about this case or the relief plaintiffs seek will allow them to prevent a single voter from casting a ballot in the November election. At most, the relief could prompt an inquiry into the bona fides of an individual's registration, and at most it could require an individual to cast a provisional ballot. At that point, the validity of the voter's registration will be determined and, with it, the validity of his or her vote. That is not only sensible but it is also fair—and it also furthers both objectives of HAVA rather than just one of them.

In the second place, the risks of harm to each party and above all the risks of harm to the public support the TRO. HAVA, all recognize, attempts to balance competing interests: enhancing access to the ballot on the one hand while preserving the value of each vote from the diluting effects of fraud on the other. In doing so, the Act no doubt imposes burdens on the States to further these goals, but the policy interests and hardship concerns that HAVA puts front and center are those affecting the *rights of voters*. Once we balance *those* interests, they point unmistakably in one direction. The window to detect and deal with vote-diluting fraud in Ohio begins to close on October 25, when the county boards of election open the first absentee-ballot envelopes. *See* ROA 482, 696. All this order does is ensure that the county boards may, if they wish, investigate voter-registration discrepancies by that date—in part by using the SWVRD (or information already derived from that database) that was designed for this purpose. If that information becomes available after October 25, when the absentee-ballot opening begins, the opportunity to follow up on voter-registration mismatches will be irretrievably lost, a concern that affects all Ohio voters. At the same time, nothing about Judge Smith's order will limit a single individual's right to vote in the normal process or at a minimum through a provisional ballot.

The Secretary's risk-of-harm arguments focus principally on burdens that the district court's TRO imposes on her, not on burdens or risks that the order imposes on Ohio voters. She raises two burdens: that it will be difficult for her office to develop a computer program to get access to this information and that any changes to the SWVRD at this late stage in the election risk creating other problems in the election process. But why all of this is so is never explained, much less supported by affidavits from the Secretary or her office. The bureaucrat's lament—that this will be difficult to do—is a hard sell given that the Secretary's office previously shared this kind of information with the county boards. And if the question is who will have a harder time obtaining meaningful access to the voter-registration mismatches—the Secretary or the county boards of election—it is difficult to see how anyone can argue that the Secretary faces the harder task. So far as the record shows, the only way the county boards can use the database would be to enter each name of every registered voter in the database to determine whether there was a mismatch for that voter. By contrast, the Secretary told the district court that she could put the program together in two to three days. *See* ROA 695, 698. As between these burdens, I am hard-pressed to understand why the Secretary's alleged difficulties outweigh the counties'. Indeed, it may be that a county-by-county list of mismatches is a public record under Ohio's public records laws, making the list available in a usable format under HAVA *and* Ohio law. *See* Ohio Rev. Code Ann. § 149.43; *cf. id.* § 3503.13(A).

The Secretary also argues that running such a program at this stage could create other problems for the election. Here, too, her argument raises more questions than it answers because she again never explains why this is so, much less supports her position with affidavits from someone who would know. The past practices of the Secretary's office—in providing this kind of information to the county boards before—again suggest that she can mitigate these risks in the same ways she mitigated them before. And if for some reason that is not the case, she has not explained why the TRO does not require relatively modest adjustments to the program—one of which would filter the data to identify mismatched records and one of which would capture the mismatches for each of the 88 counties in the State. As for risks to the database when it comes to other uses of the system during the election, it is not clear why running a report or copy of the database *before* making these adjustments would not compartmentalize, and thereby eliminate, any risks to the SWVRD. But if all of these things are exceedingly difficult for the Secretary, or worse if they would create a meaningful risk of harm to other parts of the database at this stage in the year, she needs to explain why rather than allowing her attorneys to speculate why. The record on all of this is ear-splittingly silent—all the more conspicuously so given that it is the key risk of harm identified on the Secretary's side of the case and it is the one risk that must be balanced against the risk (come October 25) of allowing potentially fraudulent votes to be forever counted.

In the third place, the Secretary mistakenly claims that the timing exigencies created by this case should be laid at the feet of the plaintiffs. All of this came to a head, the complaint alleges, when the Secretary issued her August advisory. Because state officials had spoken publicly about trying to resolve election disputes through alternative dispute resolution rather than the courts (still a good idea by the way), we should not punish the plaintiffs for failing to run to court the day after the issuance of the advisory. *See, e.g.*, Mark Niquette, *Lawyers Urged to Talk Out Election Scraps*, Columbus Dispatch, Aug. 16, 2008, at 2B. To this day, it remains unclear when the Secretary told the public that she had changed the office's prior policy on implementing §15483(a)(5)(B)(i), when she told the public why she made these changes and whether she has made additional changes to the policy since. On this record, there is no cognizable basis for punishing the plaintiffs for bringing this challenge when they did.

As for the notion that courts should hesitate to alter election procedures on the eve of an election, that is true—so far as it goes. When an election is "imminen[t]" and when there is "inadequate time to resolve . . . factual disputes," it will often be the case that courts will decline to grant an injunction to alter a State's established practice. *Purcell*, 549 U.S. at 8. But that will not always be the case. This generalization surely does not control many election-related disputes—keeping polls open past their established times *on* election day or altering the rules for casting ballots or provisional ballots *during* election week—and it is unclear why it ought to control this one. The question here is whether there is sufficient time to resolve these fact disputes when absentee-vote processing starts on October 25, and the district court determined that it will take two to three days to get the information, not that it cannot be done. Nor, it seems clear, are the plaintiffs challenging an *established* election practice of the State. The established practice in this case is the one the State used in the last national election, not the Secretary's innovation of it for this one.

At the panel stage, in deciding to vacate the district court's TRO, this court did not rely on the Secretary's position that the plaintiffs may not vindicate these rights through a private right of action under § 1983. At the en banc stage, however, the lead dissent has now embraced the Secretary's position as a ground for decision and maintains that plaintiffs have no right to bring a federal cause of action under this statute to enforce these provisions of HAVA. There is nothing wrong with this change of heart, particularly given how little time the panel had to address the issue, but it should prompt similar empathy for a district court judge forced to do the same thing: make a quick likelihood-of-success decision about what can only be described as a deeply intricate issue.

At this stage in the case, there are several reasons for accepting the district court's probability-of-success prediction on this issue. Since *Maine v. Thiboutot,* 448 U.S. 1 (1980), the Supreme Court has made it clear that § 1983 empowers claimants to file lawsuits against state officials who violate their constitutional *and* statutory rights because the provision covers "rights . . . secured by the Constitution *and laws"* of the United States. 42 U.S.C. § 1983 (emphasis added). In deciding whether a claimant may enforce a given statute through a § 1983 action, we consider three factors: (1) Did Congress "intend[] the provision in question" to "benefit" the claimant? (2) is the asserted right so "vague and amorphous" as to "strain judicial competence"? and (3) is the asserted right "couched in mandatory, rather than precatory, terms"? *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) (internal quotations marks omitted); *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 282-83 (2002). There is no doubt that the HAVA provisions at issue satisfy the second and third prongs of the test: In enacting the matching-and-verification requirements, Congress did not merely express an aspiration that state officials would cooperate in sharing information; it mandated that they "*shall* enter into an agreement to match information" for the purpose of "enabl[ing] [the officials] to verify the accuracy of the information provided on applications for voter registration." 42 U.S.C. § 15483(a)(5)(B)(i) (emphasis added). The statute thus imposes binding, enforceable duties on the Secretary that do not "strain judicial competence."

What is difficult is the first inquiry: Did the statute intend to benefit the claimants? In one sense, the answer to that question seems straightforward. In *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004), we held that another provision of HAVA—dealing with provisional ballots, 42 U.S.C. § 15482(a)—was intended to benefit individuals, and it would seem strange to infer that Congress wished to pull apart the threads of HAVA by permitting individual enforcement of some of its mandatory provisions but not others. There also seems to be little doubt that a tool designed to facilitate governmental efforts to identify voter fraud is a tool that redounds to the benefit of individuals. The whole point of curbing fraud is to prevent the dilution of individuals' votes, not to mandate anti-fraud requirements for their own stake.

What makes this question close and presumably what prompted the panel not to rely on this consideration as a basis for vacating the district court's TRO is the impact of the Supreme Court's decision in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), on this analysis. There, in discussing the first prong of the right-of-action test, the Court emphasized that "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced" under § 1983 and that such rights must be "unambiguously conferred . . . to support a cause of action brought under § 1983." *Id.* at 283. Picking up on this language, the Secretary argues that the HAVA provision at issue in *Sandusky County*—"[t]he individual shall be permitted to cast a provisional ballot," 42 U.S.C. § 15482(a)(2)—differs from the language at issue here. Even though the language in each case is mandatory and even though the language in each case identifies judicially enforceable obligations, the Secretary argues that the matching-and-verification requirements do not expressly identify any one individual or group of individuals as beneficiaries of the statutory obligation in the same way as this other provision of HAVA does.

This is a fair argument, one that this court will have to resolve with finality at some point. But it is not an argument with just one plausible answer or even a clear answer. The problem with contending that there is only one way to look at this issue is that the Secretary assumes *Gonzaga* requires individual-rights-granting language even when there is no individual to whom such language could apply. The beneficiary of every eliminated instance of voter fraud is never any one individual because the individual whose vote would have been diluted—the individual, if you will, whose "right" to vote is impaired—is never known or knowable. Perhaps when a statute effectively benefits everyone but no one in particular, a right of action still may exist, all other things being equal; perhaps it may not. But, either way, it is hard to maintain that the district court should have understood that *Gonzaga* resolved this point since it did not address, much less discuss, *this* issue. Nor did *Gonzaga* overrule earlier holdings that generally permitted the beneficiaries of federal

statutes to enforce them through § 1983. *See, e.g.*, *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 510 (1990).

There is one more oddity with accepting the Secretary's position. The right-of-action inquiry requires a court to ascertain what Congress meant in imposing certain mandatory duties on States—to "determine whether Congress *intended to create a federal right.*"  536 U.S. at 283.  To accept the Secretary's position in this case, however, we would have to infer that Congress meant to make both halves of HAVA mandatory—the ease of voting and casting provisional ballots on the one hand and the anti-fraud provisions on the other—yet wished to allow citizens to enforce just one half of those policies.  There is no indication in the statute, or for that matter in the legislative history, that this is what Congress meant, and the fact that *all* of HAVA's relevant provisions may be enforced by the United States Attorney General or through administrative processes at the state level, 42 U.S.C. §§ 15511-12, suggests that all mandates should be privately enforceable or none should be.  In the final analysis, the most that can be said about the Secretary's argument—which in its two pages of argument on this point before the district court dealt with none of these considerations—is that it raises a difficult issue.  The "close" answer to this question, together with the reality that all of the other risks of error support the plaintiffs, weigh in favor of denying the Secretary's motion to stay the TRO.  *See Ashcroft v. ACLU*, 542 U.S. 656, 664-65 (2004); *Hawaii Housing Authority v. Midkiff*, 463 U.S. 1323, 1326-27 (1983) (Rehnquist, J., in chambers); *Roth v. Bank of Commonwealth*, 583 F.2d 527, 537 (6th Cir. 1978) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) ("To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.")).

That brings us to one final point.  As the panel pointed out in vacating the district court's TRO, the record in this case is far from ample.  That is true, but it will almost always be true in the context of a TRO, the nature of which requires rapid decisionmaking.  That is what makes the standard of review—abuse of discretion—so relevant to the disposition of this emergency appeal. *See Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).  The point is not just that we give substantial discretion to the district court's ring-side view of the case in reviewing an order already issued; it is that we entrust the district court to deal fairly with future implementation issues implicated by that order.  When it comes to applying abuse-of-discretion review here, one of the key obstacles to the Secretary's request for relief is the lack of any affidavit or other factual support for her arguments that altering the relevant computer programs will be difficult or will create material risks to other aspects of the election process.  In upholding the district court's October 10 order and its October 17 deadline, it is appropriate to assume what we should always assume in denying interim relief—that the district court will respond fairly to requests to adjust the TRO if the Secretary offers reasonable bases for doing so.  With that assumption in mind and with the view that this court should now allow the district court to do its job in handling this difficult case, we deny the Secretary's motion to stay the district court's October 10th TRO.

ALICE M. BATCHELDER, Circuit Judge.  I concur entirely with the order, but I write separately because Judge Martin scolds me for failing to act on my own initiative[1] to recuse myself from the vote on whether to rehear this case *en banc*.  His accusation cannot be taken seriously, and I cannot now — as I could not when the question first came before us — justify recusing myself.

That this theory is untenable is evident from the dissent's primary example: Tipper Gore and Laura Bush could not have served on the Court hearing *Bush v. Gore*.  Well, of course not.  Gore and Bush were named parties, and the dispute was over which votes would be counted in determining which of them won the election for President of the United States.  Bill Batchelder, on the other hand, is not a named party to this lawsuit, and is one of literally hundreds of candidates on the November ballot in Ohio.[2]  Unless Judge Martin is claiming that only Republican candidates will benefit from preventing vote fraud, Bill Batchelder's candidacy is no more affected by this litigation than is the candidacy of every other individual on that ballot.

But this case is not about candidates.  It is about voters.  It is about the right of every single legally registered voter in the state of Ohio — regardless of party affiliation — to cast his or her vote, and the corresponding right of each of those legally registered voters to be protected from having that vote diluted by illegally or fraudulently cast votes.  The only thing at issue here is the ability of local elections officials to obtain the necessary information to ensure legal voting and to prevent illegal and fraudulent voting.

The principal dissent contends that our decision creates "a tool to effect widespread voter disenfranchisement," and predicts "chaotic," "unfair," and "doubt[ful]" elections.  Moore, J., dissenting at 24.  But this is an unreasonable characterization of the decision.  As the majority opinion ably (and correctly) explains:

> Nothing about this case or the relief plaintiffs seek will allow them to prevent a single voter from casting a ballot in the November election.  At most, the relief could prompt an inquiry into the bona fides of an individual's registration, and at most it could require an individual to cast a provisional ballot.  At that point, the validity of the voter's registration will be determined and, with it, the validity of his or her vote.  That is not only sensible but it is also fair . . . .

Sutton, J., at 5.

In short, there is no basis for any claim that enforcement of the voter-registration laws affects my husband differently from any other candidates because he is a Republican, or that discovery of voter fraud is more beneficial to Republicans than to others.  If, as Judge Martin suggests, my husband (and his party) stand to benefit from the outcome of this decision — that is, if my husband's chances of winning election are improved by assuring a fair election — then my husband stands to benefit in the same way as every other Ohio voter, each of whom is entitled to participate in a fair election.  None of this provides any basis upon which I could recuse.

---

[1] Neither party moved for my recusal prior to, during, or since our *en banc* consideration; nor did any member of this court make any such suggestion prior to the public issuance of this opinion.

[2] At a minimum, the impending election includes the following: President of the United States (1); United States House of Representatives (17); United States Congressional Special election (1); State Attorney General (1); State Senate (16); Ohio State House (99); Ohio Supreme Court (2); Ohio Appellate Courts (20); State School Boards (7); County Commissioners (171); Summit County Executive and County Council (9); County Coroners (84); County Sheriffs (81); and numerous races for county engineers, county prosecutors, county treasurers, plus a series of statewide ballot issues.

JULIA SMITH GIBBONS, Circuit Judge, concurring. I concur in Judge Sutton's opinion and offer these additional comments as well.

Before us is the initial issue of whether to grant en banc review of the Secretary of State's motion to vacate or stay the district court's temporary restraining order directing the Secretary of State (1) to comply with the Help America Vote Act (HAVA), 42 U.S.C. § 15301 *et seq.*, by performing the required verification of a new registrant's identity, (2) establish a process by which county boards of election can access the information generated from the checks, (3) provide county boards of election access to the information entered into the Statewide Voter Registration Database no later than October 17, 2008, and (4) provide the boards of election an effective way to access and review mismatches between voter registration information and information in the Ohio Bureau of Motor Vehicles and Social Security Administration databases. A panel of this court granted the motion, so not granting en banc review would have the effect of leaving the stay of the TRO in place.

The question before us is one of exceptional importance, involving the interpretation and application of statutory provisions designed to combat voting fraud and the dilution of validly cast votes in the context of an election for President of the United States. Although the importance of the issue is clear, the parties suggest that we also appropriately consider the role of the courts in intervening in election matters when an election is fast approaching. Plaintiffs argue that this concern favors en banc consideration, while the Secretary argues that it does not. From my perspective, this concern is better addressed in connection with the merits of the motion to vacate rather than in determining whether to grant en banc review. After all, the issue does not become less important because the election is a short time away. I therefore favor granting en banc review of the Secretary's motion to vacate.

Turning to the merits of the motion, we review the entry of the temporary restraining order for abuse of discretion. In my view, the Secretary has failed to show an abuse of discretion by the district court.

The Secretary's argument includes several legal issues. The panel adequately and correctly dealt with the jurisdictional issue. The private right of action issue is a difficult one and, while *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) may well point toward its availability, it seems that the panel was wise to avoid it. I am inclined to disagree with the Secretary's position about the requirements of the statute for the reasons stated in Judge Sutton's opinion. In any event, I cannot say that the district court committed a legal error that would constitute an abuse of discretion.

Turning to a balancing of the harms and the public interest, this is the point on which I disagree most strongly with the Secretary's position and the panel's granting of the stay. The public interest lies in two areas: carrying out the statutory goals of combating voter fraud and vote dilution and preventing disruption of elections. The harm to the plaintiffs is evident from the nature of the claim they assert; they can hardly be required to show actual vote fraud to establish irreparable harm when the county election boards lack the means to detect any fraud that may exist. And from the evidence presented to the district court and the arguments made there by counsel for the Secretary, disruption of the electoral process and interference with the Secretary in carrying out her election responsibilities as a result of the district court's order are purely speculative. Thus, any harm to the public interest in avoiding election disruption is speculative as well.

As the Secretary notes, she requested an evidentiary hearing before the district court, which the court denied. This is a typical ruling in situations involving the issuance of a temporary restraining order; permitting an evidentiary hearing would be atypical. The parties did, however, have the opportunity to submit affidavits and make arguments to the district court. As far as I can

tell, the Secretary submitted no affidavits relating to harm to her in carrying out her duties or the public interest.[1] And her counsel's oral arguments to the district court did not emphasize the harm point to any great degree. When questioned about how long compliance with plaintiffs' requested relief would take, counsel said vaguely that it could take several days or "may take longer."[2] He noted no problems with carrying out the election otherwise as a result of reprogramming to provide the relief sought. The district court's reading of the situation was that the parties might well be able to agree to a consent decree. Although that did not occur, obviously, the Secretary's position in the district court gave no hint that ordering the requested reprogramming would impede the electoral process.

Before this court, however, the Secretary blasts the district court's action, saying it acted "recklessly" and that its "cavalier attempt to micromanage Ohio officials' administration of this election is breathtaking." She complains strenuously about creation of disorder and offers speculation about "hidden dangers" of reprogramming, without any evidence or even proffer of what the dangers might be from anyone who knows anything about the database. And she raises the point, not discussed at argument in the district court, that it is simply too late for court intervention.

The panel majority, while professing disapproval of the district court's failure to engage in fact finding, adopts the Secretary's assertions in her brief on appeal without scrutiny, thus by indirection accepting them as facts. This adoption directly leads to a conclusion that the district court abused its discretion in the balancing of harms, a conclusion that is unsupported by anything that transpired in the district court.

The district court was faced with a situation in which the harms to plaintiffs seemed great, and the harms to the Secretary amounted to some programming of uncertain magnitude. Based on the Secretary's representations in the district court, the only public harm at issue was that asserted by the plaintiffs. There was no suggestion and certainly no evidence that granting the plaintiffs' request might disrupt the electoral process or harm the public in any way.

Abuse of discretion is a deferential standard, and its application here is not only the correct legal standard-it makes good practical sense. *See Purcell v. Gonzales*, 127 S. Ct. 5, 7 (2006) (per curiam) (concluding that the main error of the appeals court was its failure to accord proper deference to the findings of the district court). If we leave the district court order untouched, the Secretary is free to take back to the district court any problems she may encounter in carrying out its order. She may also explore with the district court any difficulties that carrying out the order poses for the electoral process generally. She can raise with the district court issues about whether compliance with the order provides plaintiffs with any information they can actually use for any purpose at this point. In short, a district court is the proper forum for raising belated concerns about compliance, not this court.

Returning to the question of en banc review, considered in light of the above analysis, one could argue that my focus on the balancing of the harms undercuts the reasons for granting en banc review. In other words, the argument would be that the case ceases to be one of exceptional importance if its resolution depends largely on a garden-variety balancing of the harms. In this context, I disagree. The exceptional importance of this case lies as much in the public interest concerns and party concerns about the integrity of the electoral process as it does in whether we

---

[1] The Secretary's memorandum filed in the district court addresses harm from any order requiring boards of election to note mismatches on poll books and imposing new duties on poll workers. Memorandum in Opposition of Jennifer Brunner 20-21. The district court did not order either of these remedies.

[2] Apparently, counsel also represented to the district court, perhaps in off-the-record conferences about a possible consent decree, that the reprogramming might take two or three days.

resolve with finality the existence of a private right of action or the Secretary's precise duties under HAVA.

Involving the en banc court in the stay of a temporary restraining order is rarely a good use of our resources and rarely presents an issue of exceptional importance, given the procedural posture. This is one of the rare situations, however, where, given the panel's opinion, our en banc intervention is required to protect important statutory and public values. *Purcell*, 127 S. Ct. at 7 ("A state indisputably has a compelling interest in preserving the integrity of its election process." (quoting *Eu v. S. F. County Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989))).

In my view, the court has correctly denied the motion to vacate.

ROGERS, Circuit Judge, concurring.  I concur in the order primarily for the reasons given in the opinion of Judge GIBBONS.

KETHLEDGE, Circuit Judge, concurring.  I write briefly to note my disagreement with Judge Moore's statement of the interpretative issue before the court.  Judge Moore asserts that "the issue before this court" is whether the Help America Vote Act ("HAVA") "compel[s] states to use a certain type of match system to verify voters."  [Dissent at 21.]  I respectfully suggest that is not the issue.  The issue is whether–whatever "type" of system a state might use–the system must yield a certain functionality of result.  *What* the system must accomplish, and not *how* it must accomplish it, is the issue here.  And HAVA speaks directly to that issue, by requiring that voter-registration and motor-vehicle information be matched "*to the extent required to enable* [the official responsible for the state motor vehicle authority and the Secretary] *to verify the accuracy of the information provided* on applications for voter registration."  42 U.S.C. § 15483(a)(5)(B)(i) (emphasis added).

The problem, it appears, is that the Secretary's matching system does not enable anyone to do anything with the information it collects.  And that, in my view, means the Secretary's system likely falls short of the functionality that HAVA requires.  For this reason, among others, I believe the district court did not abuse its discretion in entering the order before us.

KAREN NELSON MOORE, Circuit Judge, dissenting from hearing en banc and from reinstating the district court's Temporary Restraining Order. I dissent from the decision of this court to grant the motion for initial hearing en banc and the "Renewed Petition for Immediate En Banc Review," thereby reinstating the district court's Temporary Restraining Order ("TRO") that imposes burdens on the Ohio Secretary of State ("Secretary") that are contrary to federal and state law. This case is wholly inappropriate for initial or immediate hearing en banc. Not only have the criteria for initial hearing or rehearing en banc not been satisfied, but also the en banc court is particularly ill-suited to consider in the first instance swiftly developing election-law issues in the compressed time period now available. The majority's action is judicial activism in the extreme.

## I. OPPOSITION TO GRANT OF EN BANC REVIEW

The panel assigned to this case pursuant to Sixth Circuit rules has considered carefully the materials filed on behalf of both sides in this dispute and has issued an order staying the temporary restraining order improperly entered by the district court. The motion for hearing en banc filed by the Ohio Republican Party and Larry Wolpert (collectively "ORP") at this time is nothing more than a blatant attempt of ORP to overturn the duly authorized panel's decision to stay the district court's order that required the Secretary of State to likely violate both the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). By granting this motion and reinstating the district court's TRO, the majority of this court acts contrary to our own precedent, fails to follow the Supreme Court's precedent, and creates a new circuit split.

The Secretary should not be required by various federal judges to violate those federal statutes, nor should she be required to reconfigure and reprogram the state's computers and practices this close to an election. Because the granting of en banc hearing and the simultaneous reinstatement of the district court's temporary restraining order will throw the election process in Ohio into total chaos, I dissent.

On October 10, 2008, the Sixth Circuit panel stayed the district court's temporary restraining order. In our opinion, we explained our reasoning and concluded as follows:

> It is clear that the district court's four specific orders insert the federal court into the delicate balance struck by HAVA. We have expressed our concern that under established law ORP does not have a private right of action under 42 U.S.C. § 15483(a)(5)(B)(i). Assuming ORP has the right to bring such an action, we believe that the Secretary is likely to succeed on the merits of the issue of the proper interpretation of HAVA; HAVA does not mandate that the Secretary undertake the particularized matching required by the district court's TRO. Further, the irreparable harm caused by the district court's TRO is significant. With less than a month until the election, and less than two weeks until the beginning of counting absentee ballots, the Secretary cannot be required to undertake the extensive reprogramming and other changes to the election mechanics without complete disruption of the electoral process in Ohio. The irreparable harm to the voting public caused by the district court's order is equally clear. Finally, the intrusion into the state's processes by the federal courts with the ensuing confusion regarding the applicable process weighs heavily against the district court's order.
>
> As the Supreme Court wrote in *Purcell*, "Given the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction" altering the state's established practice. *Purcell* [*v. Gonzalez*], 549 U.S. [1,] 8 [2006]. We hereby stay the district court's TRO . . . .

Sixth Circuit panel opinion of October 10, 2009 at 11-12.

ORP asserts that hearing this case initially en banc and bypassing the duly assigned panel (or rehearing en banc) is appropriate because of the importance of the issues presented and the press of time. The time pressures in this case are entirely caused by ORP's last-minute challenges to the procedures initiated by the Secretary of State's office before the current Secretary began her position in 2007. While the Secretary's procedures have been known and in effect for a considerable time, ORP waited to file its suit in the district court until September 26, 2008, and did not file its motion for this temporary restraining order until October 5, 2008. If ORP had truly wanted to have review of the methods and procedures used by the Secretary, it should have brought its action much earlier. More importantly, the NVRA specifically requires that "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" must be completed at least 90 days prior to a federal election. 42 U.S.C. § 1973gg-6(c)(2)(A). HAVA provides for removing voters in accordance with the NVRA, and the latter does not permit registered voters to be removed based on computer matching. 42 U.S.C. § 15483(a)(2)(A)(i); 42 U.S.C. § 1973gg-6.

Thus ORP has brought its action too late to obtain its requested relief; ORP's claimed press of time is both self-created and self-defeating. The press of time is not a valid basis for obtaining hearing en banc in this case.

The other reason asserted by ORP for hearing en banc is that the case "is an extraordinary case, involving the integrity of the election for President of the United States . . . in a state vital to both candidates' chances at victory." The Federal Rules of Appellate Procedure allow hearing or rehearing en banc where "the proceeding involves one or more <u>questions of exceptional importance, each of which must be concisely stated</u>." Fed. R. App. P. 35(b)(1)(B) (emphasis added). Yet ORP completely fails to comply with the requirements of this Rule: it has not specified in its motion for hearing en banc ANY specific question of exceptional importance. ORP's utter failure to comply with the Federal Rules of Appellate Procedure suggests that its effort to obtain hearing en banc concerning this temporary restraining order is based on ORP's dissatisfaction with the panel's composition or with the merits of the decision of the duly assigned Sixth Circuit panel to stay the previous temporary restraining order issued by the district judge in this case. ORP is simply trying to get a different result by having a different forum within the Sixth Circuit.

In summary, a hearing en banc in this case is wholly unwarranted and entirely unjustified. Granting a hearing en banc on this flawed motion and in light of the circumstances of this litigation is unsound intellectually and without any valid justification. Any lawyer reading the plaintiffs/appellees' motion for initial hearing en banc or its renewed motion can see that substantively it is baseless and procedurally it violates the Federal Rules of Appellate Procedure.[1] I dissent from the majority's rash and meritless decision to grant en banc review and to reinstate the district court's TRO.

---

[1]The "Renewed Petition for Immediate En Banc Review" consists of one paragraph reiterating that plaintiffs/appellees "continue to seek immediate en banc review of" the Secretary's motion to vacate or stay the district court's temporary restraining order. This one-paragraph document does not add any substantive information. Instead, this document wrongly asserts that the panel improperly issued a stay while the petition for initial en banc hearing was pending before the court. Under long-standing Sixth Circuit rules, the panel has full authority to act until the court has decided to grant en banc hearing. The panel simply preserved the status quo that existed before the district judge entered his improper temporary restraining order. If the panel were not permitted to act once a party filed a request for en banc hearing, we would have parties running—indeed hijacking—the court. Any party disliking a panel to which it was assigned could attempt to stop that panel in its tracks by filing a motion for en banc hearing, just as plaintiffs/appellees have done here. In every instance of which I am aware, panels of this court routinely issue orders concerning cases while petitions for en banc are pending. Moreover, a petition to review en banc a decision of a Sixth Circuit motions panel to issue a stay is explicitly prohibited by our Sixth Circuit Rules. Sixth Circuit Internal Operating Procedures ("IOP") 35(e) (prohibiting en banc review petitions regarding panel decisions staying TROs and issuing other nonfinal orders). Thus, ORP is completely wrong in its procedural posture and analysis.

## II. ORP HAS NO PRIVATE RIGHT OF ACTION

In addition to disagreeing with this court's decision to grant en banc review, I must dissent from its decision to reinstate the district court's temporary restraining order. On its face, HAVA does not create a private right of action. Supreme Court precedent makes it absolutely clear that the provisions of HAVA at issue here, 42 U.S.C. §§ 15483(a)(1)(A) & (a)(5)(B)(i), do not create federal rights enforceable by private plaintiffs under 42 U.S.C. § 1983. For a statute to be enforced via § 1983, Congress must have unambiguously intended to create an individual right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-85 (2002). However, these provisions of HAVA regulate the conduct of *officials* involved in the voting process; they do not create rights enforceable by individual voters. In sharp contrast to the statutory provisions that the Supreme Court and this circuit have recognized as establishing privately enforceable rights, the HAVA provisions at issue in this case contain absolutely no rights-creating language. It is not surprising, therefore, that *no* court has interpreted these provisions as conferring a right enforceable by private plaintiffs under § 1983. Instead HAVA provides its own enforcement mechanisms, specifying that the U.S. Attorney General may bring suit to enforce HAVA. 42 U.S.C. § 15511. The U.S. Attorney General has not brought suit.[2]

A statute is enforceable via a private right of action under § 1983 only if contains "an unambiguously conferred right." *Gonzaga*, 536 U.S. at 283. "[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.* If a "statute by its terms grants no private rights to any identifiable class," then Congress did not intend to create a private right of action. *Id.* at 283-84 (internal quotation marks omitted). This inquiry begins with the text of the statute. "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" *Id.* at 284 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). By contrast, statutes that "speak only in terms of institutional policy and practice" or that "have an 'aggregate' focus" do not confer a right that may be enforced via § 1983. *Id.* at 288.[3] Similarly, "[s]tatutes that focus on the person regulated rather than the individuals protected" do not confer enforceable rights. *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (internal quotation marks omitted).

The provisions of HAVA at issue here contain absolutely no rights-creating language. Instead, they impose an obligation on state officials to establish a voter-registration system meeting certain criteria. Section 15483(a)(1)(A) requires each state to "implement . . . a . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State . . . ." 42 U.S.C. § 15483(a)(1)(A). Section 15483(a)(5)(B)(i) further requires that "[t]he chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." 42 U.S.C. § 15483(a)(5)(B)(i). These provisions focus on the administration of federal elections and the duties of state *officials* to establish institutional mechanisms meeting certain criteria. Nothing in these provisions contains the sort of rights-focused language that the Supreme Court has required to establish a privately enforceable right.

---

[2] As the Supreme Court observed in *Gonzaga*, 536 U.S. at 280, "'In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.'" (quoting *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)).

[3] The majority contends that it is an open question whether a statute creates a privately enforceable right when it "benefits everyone but no one in particular." Sutton Op. at p. 7. But the Supreme Court has repeatedly answered this question in the negative. *See Gonzaga*, 536 U.S. at 288.

The paradigmatic statutes containing the requisite rights-creating language are Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). Those provisions contain similar explicit rights-creating language. 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."). Because each of these provisions has an "*unmistakable focus* on the benefited class," the Supreme Court has recognized that each creates privately enforceable rights. *Gonzaga*, 536 U.S. at 284 (internal quotation marks omitted).

In *Gonzaga*, by contrast, the Supreme Court found that a provision of the Family Educational Rights and Privacy Act of 1974 ("FERPA") prohibiting federal funding of educational institutions with a policy or practice of releasing records to unauthorized individuals did not create a privately enforceable right. That provision of FERPA provided that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of educational records . . . of students without the written consent of their parents to any individual, agency, or organization." *Gonzaga*, 536 U.S. at 279 (quoting 20 U.S.C. § 1232(g)(b)(1)). Distinguishing this FERPA provision from the rights-creating language of Title VI and Title IX, the Court noted that it spoke only to government officials rather than to individuals potentially benefited under the statute. *Id.* at 287-88. The Court concluded that the FERPA provision "entirely lack[ed] the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Id.* at 287.

Unlike the individually focused language of Title VI and Title IX ("No person . . . shall . . . be subjected to discrimination . . . ."), and like the FERPA provision at issue in *Gonzaga*, the HAVA provisions in this case speak only to government *officials*. HAVA directs that state election officials "implement . . . a computerized statewide voter registration list," 42 U.S.C. § 15483(a)(1)(A), and that they "enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration," 42 U.S.C. § 15483(a)(5)(B)(i). In other words, these provisions require state officials to maintain a centralized statewide computerized voter registration list and to maintain that list according to certain standards. Nothing in these provisions refers to the "rights" of "individuals" or "voters." Thus, unlike Title VI and Title IX and like the FERPA provision at issue in *Gonzaga*, these HAVA provisions focus only on government *officials,* who are directed to take certain actions, rather than on individuals who may benefit from the provisions. Consequently, like the FERPA provision at issue in *Gonzaga*, these HAVA provisions "lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Gonzaga*, 536 U.S. at 287.

The HAVA provisions at issue in this case also differ dramatically from the rights-creating language contained in HAVA § 302(a)(2), which we have held creates a private right enforceable via § 1983. *See Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 572-73 (6th Cir. 2004). The provision at issue in *Sandusky*, HAVA § 302(a)(2), provides that upon making the required affirmation, an "*individual shall be permitted* to cast a provisional ballot." 42 U.S.C. § 15482(a)(2) (emphasis added). In *Sandusky*, we concluded that "[t]his language mirrors the rights-creating language of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972." 387 F.3d at 572. We further noted that "this language markedly differs from the statutory language found by the Supreme Court in *Gonzaga* to be insufficiently focused on the benefited class to create an individually enforceable right." *Id.* at 573. We also stated that § 302 of HAVA "refers explicitly to the '*right of an individual to cast a provisional ballot*,' . . . and

requires states to post information at polling places about this right along with 'instructions on how to contact the appropriate officials if *these rights* are alleged to have been violated.'" *Id.* at 573 (emphasis in original) (citing 42 U.S.C. § 15482(b)(2)(E)). By contrast, the HAVA provisions at issue in this case do not so much as mention "individuals" or "rights." Instead, these provisions are directed solely at regulating the conduct of state election officials.

Finally, nothing in HAVA's legislative history indicates that Congress intended to create a private right of action to enforce the provisions at issue in this case, 42 U.S.C. §§ 15483(a)(1)(A) & (a)(5)(B)(i). If anything, the legislative history weighs against the recognition of privately enforceable rights under HAVA, because Congress apparently considered, and rejected, the creation of an express private right of action under HAVA. Senator Christopher Dodd, a sponsor of HAVA and principal Senate author of the conference report, stated that "[w]hile [he] would have preferred that we extend [a] private right of action . . . , the House simply would not entertain such an enforcement provision[]. Nor would they accept federal judicial review of any adverse decision by a State administrative body." 148 Cong. Rec. S10505 (daily ed. Oct. 16, 2002) (statement of Sen. Dodd).

Despite the fact that HAVA does not create a private right of action, it imposes binding duties on the Secretary of State which *are enforceable* through alternative means. In states receiving certain federal funding, individuals may challenge actions by the election officer through an administrative complaint system established by the state. *See* 42 U.S.C. § 15512; *Sandusky*, 387 F.3d at 573 (acknowledging this administrative remedy). Regardless of funding, HAVA permits the U.S. Attorney General to bring a civil action against any state to enforce HAVA's requirements. *See id.* § 15511. Given these mechanisms, it is absurd to assert that HAVA does not impose binding, enforceable duties on the Secretary; Congress has simply determined that private lawsuits are *not* the best method of enforcing HAVA. Although we have previously held that these enforcement provisions do not foreclose private suits to enforce the right of an individual to a provisional ballot, *see Sandusky*, 387 F.3d at 573, these provisions suggest that Congress did not intend for private suits to be the means of enforcing the HAVA provisions now at issue that are directed toward duties of state officials and are not creating individual rights.

Therefore, pursuant to well-established Supreme Court and Sixth Circuit precedent, ORP has no explicit or implied private right of action to bring this lawsuit or to seek the relief granted by the district court and the en banc majority. Therefore, I would dismiss this action because plaintiffs have failed to state a claim on which relief can be granted. The majority's contrary finding that there is an implied private right of action here violates Supreme Court precedent such as *Gonzaga*, 536 U.S. at 283-85, and violates Sixth Circuit precedent that members of the majority have previously joined.[4] Such judicial intervention in conflict with the intent of Congress in writing the Help America Vote Act is inexplicable and improper. I dissent from the majority's decision to permit ORP to proceed with its claims.[5]

---

[4] *See, e.g.*, *Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006) (Boggs, C.J., joining in holding no implied private right of action); *Hughlett v. Romer-Sensky*, 497 F.3d 557, 563-64 (6th Cir. 2006) (McKeague, J., holding no private right of action); *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 710-11 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 985 (2007) (Batchelder, Gibbons, J.J., joining in holding no private right of action); *Johnson v. City of Detroit*, 446 F.3d 614 (6th Cir. 2006) (Griffin, Gibbons, J.J., joining in holding no private right of action); *Caswell v. City of Detroit Housing Comm'n*, 418 F.3d 615, 618-20 (6th Cir 2005) (Batchelder, J., joining in holding no private right of action); *Barton v. Summers*, 293 F.3d 944, 951-55 (6th Cir. 2002) (Boggs, J., holding no implied private right of action); *Cline v. Rogers*, 87 F.3d 176, 182-84 (6th Cir.), *cert. denied*, 519 U.S. 1008 (1996) (Batchelder, J., holding no implied private right of action).

[5] Judge Sutton faults the panel for having assumed that a private right of action could be implied when the panel issued its October 10 opinion. It was perfectly appropriate for the panel to assume a private right of action and then to deny relief to the plaintiffs. What Judge Sutton and the majority do, however, is completely illogical: they assume a

### III.  THE MOTION TO VACATE THE TRO SHOULD BE GRANTED

Even assuming that a private right of action exists under HAVA, I believe that *Northeast Ohio Coalition for Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006), demands that this court issue a stay and vacate the district court's temporary restraining order.

### A.  Success on the Merits

The Help America Vote Act, known as HAVA , requires each state to:

> implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State (in this subsection referred to as the "computerized list")[.]

42 U.S.C. § 15483(a)(1)(A).  Further:

> The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

42 U.S.C. § 15483(a)(5)(B)(i).

Under the plain language of the statute, it is clear that all that this section requires is that a state:  (1) have an agreement between the election official and the motor vehicle authority official to share and compare information in the statewide voter registration system with information in the motor vehicle authority database; and (2) give the state election official and the motor vehicle official the ability to check voter registration information in the system.  There is absolutely no language that imposes an affirmative duty on any state official to enable a purge of voters by either scouring the database to locate mismatches or by providing a system that would allow a person to make such a search.  "It is clear from the language of the statute and by looking at legislative history that HAVA's matching requirement was intended as an administrative safeguard for 'storing and managing the official list of registered voters,' and not as a restriction on voter eligibility." *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1268 (W.D. Wash. 2006).  In fact, the two federal courts to consider the provision in question here, *Reed* and *Florida NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), both rejected the argument asserted by ORP that HAVA requires matching to be used to verify eligible voters. *Reed*, 432 F. Supp. 2d at 1268; *Browning*, 522 F.3d at 1172.  The *Reed* court stressed that the matching system is simply one way that a new voter who registered by mail could be verified. *Reed*, 432 F. Supp. 2d at 1268.  *Reed* went on to explain that a system that made matching the only way to verify voter identity would violate HAVA. *Id.* at 1269 ("[R]equiring a match prior to registration directly conflicts with 42 U.S.C. 15473(b)."). In *Browning*, the Eleventh Circuit acknowledged that, while HAVA would allow a state to require that an individual have a match to be eligible to vote, HAVA did not compel such a requirement. *Browning*, 522 F.3d at 1172.

---

private right of action can be implied and then *grant* the plaintiffs relief based on the assumed right to bring a claim. As this dissent has explained, there is no explicit or implied private right of action here.

Though *Browning* and *Reed* disagree as to whether a state can choose to base voter eligibility solely on matching, they agree on the issue before this court: HAVA does not compel states to use a certain type of match system to verify voters. All that HAVA requires is that election officials have some method by which to verify registrations. The language of HAVA does not mandate what system the states must use to match or verify votes, leaving such decisions to the discretion of the states. The majority of this circuit thus conflicts with the Eleventh Circuit and creates a circuit split that should be resolved by the Supreme Court.

It boggles the mind that the majority can distort this simple language to force a state to implement a specific type of match system. This conclusion flies in the face of HAVA's own directive that the <u>State gets to choose</u> how to implement HAVA. 42 U.S.C. § 15485 ("The specific choices on the methods of complying with the requirements of this subchapter shall be left to *the discretion of the State*." (emphasis added)). I cannot comprehend why the majority is going to such lengths to force this strained interpretation into the case law, and I dissent from the majority's violation of the plain statutory language.

Moreover, the majority's view would require the Secretary to violate the National Voter Registration Act ("NVRA") and HAVA. HAVA specifically provides for the removal of voters "in accordance with the provision of the National Voter Registration Act of 1993." 42 U.S.C. § 15483(a)(2)(A)(i). NVRA, however, does not permit registered voters to be removed based on computer matching. *See* 42 U.S.C. § 1973gg-6. Indeed, the NVRA requires that "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" must be completed at least 90 days prior to a federal election. § 1973gg-6(c)(2)(A). The stated purpose of the TRO is to allow for an "effective way to access and review the mismatches" located in the current database, because, allegedly, "some mismatches will reflect voter fraud." Dist. Ct. Ord. at 11. Thus, the TRO demands a "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." § 1973gg-6(c)(2)(A). Therefore, the TRO, now sanctioned by the majority's forced interpretation of HAVA, mandates that the Secretary violate federal law. Congress cannot have intended HAVA to be read in such a way.

Applying the correct interpretation of this statute to the facts in this case, I believe Ohio is likely in compliance with HAVA. Currently, the Secretary has a database which matches the information a voter provided when registering to vote with the information contained in the Ohio Bureau of Motor Vehicles database. If there is a mismatch, the database notes the mismatch. This record of mismatches in the database is accessible by both the Secretary and the individual boards of election in Ohio. The individual boards of election can query a voter's match status in real time in order to verify registration.[6] This is all HAVA requires. It is true that the statewide voter database does not provide for a list of these mismatches, but HAVA does not require that level of user-friendliness. To be sure, it might be nice if the system printed out a list of individuals within, for example, a particular precinct, that did not match, but I refuse to manipulate the clear language of Congress in HAVA to require Ohio to comply with a particular interested private party's view of what type of match system would be best. For all these reasons, I conclude that the likelihood that the Secretary will succeed on the merits is great.

---

[6] Judge Sutton's/the majority's opinion misleadingly suggests that there has been an "apparent 'turn[ing] off' of this voter-registration-verification process." Sutton Op. at p. 3. However, although the precise procedures outlined in section 15.4 of the manual appear to have been discontinued, the computerized verification process has never been "turned off." According to Gus Maragos, who has served as Ohio's Statewide Voter Database Coordinator since July 23, 2007, during his tenure the computerized verification process "has never been intentionally 'turned off' but rather has operated without intentional interruption." Secretary Br., Ex. 3 (Maragos Aff. at 2).

## B.  Irreparable Harm

The district court found that there would be no harm to others, including the Secretary, if it issued the TRO that ORP sought.  This determination is wholly unsubstantiated and contrary to the realities of the TRO issued.  In a week, the database that the district court has ordered to be reprogrammed "will be used to generate the Election Day poll books."  Secretary Br. at 19.  The district court made its reprogramming order without hearing any evidence pertaining to how such a reprogramming would affect the existing election system and, more importantly, how long it would take to test the reprogrammed system, retrain personnel, and ensure that the new reprogramming did not cause problems.  The Supreme Court has exhorted courts to exercise "proper judicial restraint" before making "precipitate changes" to election procedures and policies when "an impending election is imminent and a State's election machinery is already in progress." *Reynolds v. Sims*, 377 U.S. 533, 585-86 (1964); *see also Purcell v. Gonzalez*, 549 U.S. 1, 7-8 (2006).  Election procedures are matters of state law, and federal courts should hesitate to interfere, particularly when operating on limited information in the weeks preceding an election.  *See Purcell*, 549 U.S. at 7-8.

The Secretary must handle all problems related to the reprogramming that is required under the district court's novel order embraced by the majority of the en banc court.  The most alarming possible side-effect of reprogramming would be that a programming glitch could cause validly registered voters to be inadvertently purged from poll books.  Such a glitch would leave the Secretary with a database that can no longer be trusted for use in generating the poll books required for the election, causing "delays and inaccuracies in the creation of the poll books."  Secretary Br. at 19.  The short time-frame available to comply with the TRO amplifies the risk of programming errors, one of numerous significant problems presented by the requirements imposed by the district court on short notice.

Additionally, even if the court-ordered reprogramming works perfectly, the Secretary will be faced with a large number of mismatches to contend with at the last minute.  *See* Brennan Ctr. Amicus Br. at 12-13; Ohio Democratic Party ("ODP") Amicus Br. at 23-24.  Because of the time limitations, voters whose information does not match may not be aware that there is any question about their registration and may not have or be able to obtain the documents necessary to further verify their registration.  It is unlikely that the state can properly investigate all of the mismatches created by the TRO, and as a result, properly registered voters will likely be forced to cast provisional ballots, will believe that they cannot vote, or will be turned away at the polling places. *See Purcell*, 549 U.S. at 7 (demanding "careful consideration" of any legal challenge that involves "the possibility that qualified voters might be turned away from the polls").  It is worth noting that the procedures each county uses to deal with these mismatches may not be uniform and could result in disproportionate disenfranchisement.  *See Bush v. Gore*, 531 U.S. 98, 110 (2000) (per curiam) (noting importance of statewide standards for resolving questions of voting procedure).  This confusion over what HAVA requires in terms of matching would affect not only Ohio, but every state in the country.  ODP Amicus Br. at 15-16.

Moreover, at a time when the Secretary is already busy with routine election procedures, the TRO will require the Secretary to expend significant scarce resources on the reprogramming and matching effort.  This diversion of resources could leave the state unable to respond to routine election issues such as broken voting machines and lines at polling places.  If significant energies are devoted to matching issues, the orderly administration of the election will suffer.  For all these reasons, I conclude that the Secretary would suffer irreparable injury if we do not grant a stay and vacate the district court's TRO.

## C. Substantial Harm to Others and Public Interest

Given the fact that hurriedly reprogramming the database could lead to the purging of validly registered voters, a stay of the district court's intrusive TRO is necessary to protect the voters of Ohio. Though I agree with the district court's conclusion that "safeguarding the legitimacy of the election of the President of the United States," Dist. Ct. Ord. at 15, is of great public importance, the TRO is not required to protect that interest. It is striking that both the district court and the majority of this court have determined that the TRO is the proper remedy without any factfinding. The district court stressed that the public, as well as ORP, would be injured by voter fraud if a TRO were not granted. Dist. Ct. Ord. at 12-14. This is the kind of inquiry that demands extensive factfinding. *See Purcell*, 549 U.S. at 7-8. However, rather than undertake such factfinding, the district court, citing two newspaper articles, merely assumed that there will be widespread voter fraud absent the issuing of a TRO. Numerous other newspaper articles quote election officials who distinguish voter-registration fraud from actual voter fraud, and who indicate that actual improper voter registrations are already being detected. *See, e.g.*, Joe Guillen, *Multiple Registrants Tell Cuyahoga County Elections Board ACORN Workers Begged for Signatures*, Cleveland Plain Dealer at A-1 (Oct. 14, 2008). Given the shaky ground on which the district court's suggestion of voter-fraud rests, I believe that this unsubstantiated fear does not warrant the district court's intrusion into the established state practice.

Additionally, available evidence indicates that this intrusive TRO will cause more harm than it seeks to address. Computer matching is not a reliable way to verify voter eligibility. Brennan Ctr. Amicus Br. at 12-13; ODP Amicus Br. at 19-20; ACLU Amicus Br. at 7-8. Indeed, evidence from other states indicates that human error, not fraud, causes most mismatches. ODP Amicus Br. at 19. Data suggests that when the database match is conducted, anywhere from 15 to 30 percent of registered voters will fail to match. Brennan Ctr. Amicus Br. at 12-13. Disturbingly, mismatches have been shown to bar non-white voters more frequently than white voters. ACLU Amicus Br. at 7-8. Data from the Secretary of State shows that there are at least 485,000 new registered voters in Ohio this year. Rich Exner, *Ohio Voter Registration Surges*, available at http://www.cleveland.com/datacentral/index.ssf/2008/10/ohio_voter_registration_surges.html#more (Oct. 6, 2008). Given these numbers, the TRO issued by the district court and revived by today's result, could result in anywhere between 72,750 to 145,500 registered voters being removed from voting rolls, being forced to cast provisional ballots, or being otherwise wrongly disenfranchised.

In contrast to these concrete projections, ORP has failed to present evidence that any voters, including those who have registered in the last year, have committed actual voting fraud. Indeed, data collected by the Brennan Center, the same non-partisan organization that studied the failure rate of data matching, indicates that actual voter fraud is extremely rare. Justin Levitt, *The Truth About Voter Fraud*, available at http://www.brennancenter.org/content/resource/truthaboutvoterfraud/ (Nov. 09, 2007). The Brennan Center noted that "claims of voter fraud are frequently used to justify policies that do not solve the alleged wrongs, but that could well disenfranchise legitimate voters." *Id.* at 3. In fact, this report noted that "[t]he most common source of superficial claims of voter fraud, and the most common source of error, probably involves matching voter rolls against each other or against some other source to find alleged double voters, dead voters, or otherwise ineligible voters." *Id.* at 8. Similarly, the League of Women Voters of Ohio and the Coalition on Homelessness and Housing in Ohio studied the 9 million votes cast in Ohio between 2002 and 2004, and found only *four fraudulent ballots*. Let the People Vote, available at http://www.cohhio.org/alerts/Election%20Reform%20Report.pdf (Jun. 14, 2005). Therefore, the matching policy mandated by the TRO purportedly to eliminate voter fraud is actually likely to cause mismatches which will erroneously be labeled voter fraud, thereby disenfranchising individual

voters and undermining public confidence in election results.[7] The likelihood that this last-minute TRO will undermine confidence in the election results and will adversely affect, and perhaps even disenfranchise, a large number of voters is greater and more disturbing than the possibility that fraudulent votes will dilute the strength of legitimate ballots. *Cf. Purcell*, 549 U.S. at 7.

On the eve of the presidential election, ORP asks this court to derail election procedures that have been months in the making. The stay that the majority has vacated would simply have preserved the status quo and allowed Ohio to conduct its elections in the orderly method it had planned. The majority's ruling today upends all order, injects the potential for erroneous disenfranchisement of qualified voters into the election, and creates confusion surrounding voting rights on the unverified specter of potential fraud. In a case involving legislative apportionment, an issue which raises the same questions of vote dilution that prompted the district court to issue a TRO, the Supreme Court highlighted the importance of not making hasty, unconsidered changes to election plans on the eve of major elections:

> under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds*, 377 U.S. at 585.

The TRO perverts the clear language of HAVA, and makes a provision meant to "ensure that every American who is eligible to vote can vote" into a tool to effect widespread voter disenfranchisement. 148 Cong. Rec. S2527 (daily ed. Apr. 11, 2002) (statement of Sen. Daschle). The harm that the TRO will inflict on the Secretary, the voters, and the public is clear: elections in Ohio will be chaotic at best, blatantly unfair at worst, and doubt will fall on the validity of election results across the state. The mere specter of voter fraud, often raised but seldom proven, is the only injury that ORP asserts, and this unfounded threat cannot be used to coerce courts into acceding to the eleventh-hour demands of a partisan group that is intimately concerned with the results of the

---

[7]Members of the majority lightly assume that reinstating the TRO will not harm individual voters. Sutton at ¶ 22 ("Nothing about this case or the relief plaintiffs seek will allow them to prevent a single voter from casting a ballot in the November election. At most . . . it could require an individual to cast a provisional ballot."). This short-sighted assessment ignores the reality that voters do not always know they have a right to cast a provisional ballot and even when they do, may not understand the procedure or be able to wait for necessary assistance. *See* Ohio Rev. Code § 3505.181 (explaining the complex Ohio provisional ballot requirements). Notably, some who cast provisional ballots in Ohio are required to bring verifying information to the board of elections within ten days or else their votes will not be counted. *Id.* This is a burden that many individuals cannot bear. *See* Ari Z. Weisbard, *Placebo Ballots: Will "Fail-Safe" Voting Fail?* at 2, available at http://www.demos.org/pubs/HAVA%20-%20Placebo%20Ballots%20bw%20101904.pdf (Oct. 2004). Additionally, there is no guarantee that such ballots will be counted in time to affect the election. Daniel P. Tokaji, *An Unsafe Harbor: Recounts, Contests, and the Electoral College*, 106 Mich. L. Rev. First Impressions 84, 87 (2008) ("One of the major steps before a final vote total can be ascertained is determining which provisional ballots should be counted, a process that would almost surely become heated in a tight election. It is difficult to see how the process of verification of ballots, let alone any judicial proceedings that might take place over the canvassing and recounting of ballots, could be completed by the safe harbor date."); Chandler Davidson, et al., *Vote Caging as a Republican Ballot Security Technique*, 34 Wm. Mitchell L. Rev. 533, 541 (2008) ("A survey of provisional ballots nationwide in 2004 found that only sixty-eight percent of the 1.6 million [provisional] ballots cast were counted.").

election it seeks to control.  Accordingly, I would hold, as I did previously, that we should stay the TRO originally issued by the district court.

## IV.  CONCLUSION

It is clear that the district court's four specific orders insert the federal court into the delicate balance struck by HAVA.  I believe that under established law, there is no private right of action under 42 U.S.C. § 15483(a)(5)(B)(i).  Even if ORP had the right to bring such an action, which it does not, I believe that the Secretary is likely to succeed on the merits of the issue of the proper interpretation of HAVA; HAVA does not mandate that the Secretary undertake the particularized matching required by the district court's TRO.  Further, the irreparable harm caused by the district court's TRO is significant.  With less than three weeks until the election, and less than twelve days until the beginning of counting absentee ballots, the Secretary cannot be required to undertake the extensive reprogramming and other changes to the election mechanisms without complete disruption of the electoral process in Ohio.  The irreparable harm to the voting public caused by the district court's order is equally clear.  Finally, the intrusion into the state's processes by the federal courts with the ensuing confusion regarding the applicable process weighs heavily against the district court's order.

As the Supreme Court wrote in *Purcell*, "Given the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction" altering the state's established practice. *Purcell*, 549 U.S. at 8. Accordingly, I would hold that:  (1) granting of en banc is inappropriate; (2) there is no private right of action and thus ORP's claims must be dismissed; and (3) on the merits, we should **GRANT** the Secretary's motion to vacate the district judge's intrusive and invalid temporary restraining order. I dissent.

BOYCE F. MARTIN, JR., Circuit Judge.  I join Judge Moore's well-reasoned dissent and would deny the petition to rehear this case en banc and would grant the motion to vacate the TRO. In a case full of irony, we have a majority of this court inferring a private right of action – on the basis of, well, nothing – to create utter bedlam in a state's election. But Judge Moore has already covered that issue exceptionally well. What I want to highlight is something legitimately troubling, especially compared to what Judge Griffin found so "troubling" in his panel dissent.

What I find troubling is the fact that Judge Batchelder did not recuse herself from voting for rehearing this case en banc, while her husband stands for reelection this year as a state representative in Ohio, whose election will no doubt be substantially altered by the way the en banc majority ultimately decides this case. At stake here is the public's confidence not only in the outcome of its elections, but also in the impartiality of its judges who must, from time to time, review the procedures which govern those elections.

The standards on this issue are clear. 28 U.S.C. § 455 requires federal judges to disqualify themselves "in any proceeding in which [their] impartiality might reasonably be questioned."  The Supreme Court has told us that the standard is objective, and what matters "is not the reality of bias of prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "Quite simply and quite universally, recusal [is] required whenever impartiality might reasonably be questioned." *Id*. (quotations omitted).

When Congress enacted this language as an amendment in 1974, it was not semantics. The previous version of the statute only required recusal when a judge had a "substantial interest" in a case; now judges must recuse themselves when their impartiality "*might* reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added); *Liteky*, 510 U.S. at 547. The upshot is that judges should be more cautious.

And § 455 does not stop at this catchall provision. We are also told that a judge "shall" disqualify himself or herself when he or she "has a personal bias or prejudice concerning a party," 28 U.S.C. § 455(b)(1), and when his or her spouse "[i]s a party to the proceeding, or an officer, director, or trustee of a party" or "[i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5).  If to quote this language is not to decide whether Judge Batchelder ought to have recused herself, I will elaborate. First, it is arguable that her husband, being a Republican candidate and long-serving member of the Ohio House of Representatives, is a "party" in this case as an "officer" of the Ohio Republican Party, a named plaintiff. Obviously, the language referring to "officers" and "directors" contemplates corporate entities, but there is nothing in the language to indicate that it should not include political parties. The Deputy Speaker of the House no doubt wields as much power within his own party as, say, a vice-president of a corporation.

Even more significant is the language from § 455(b)(5): there can be little argument that Judge Batchelder's husband will not be "substantially affected by the outcome of [this] proceeding." Although the actual *result* of Ohio's elections is not directly before us, no one would argue that Tipper Gore or Laura Bush, were they to have sat on the U.S. Supreme Court in 2000, would not have had to recuse themselves in *Bush v. Gore*, 531 U.S. 98 (2000). It blinks reality to say that the outcome of this case will not have a "substantial" effect on Ohio's elections and thus on Representative Batchelder's re-election prospects.

Finally, even assuming that, under some tortured reading of the statute, one could argue that the outcome of this case would not "substantially affect" Judge Batchelder's interests here, what cannot be argued is that her vote was proper under the ABA Model Code of Judicial Conduct. ABA Model Code of Judicial Conduct Rule 2.11 (2007) states that a "judge shall disqualify himself or herself" when "the judge's spouse or domestic partner" "has more than a de minimis interest that

could be substantially affected by the proceeding." ABA Model Code of Judicial Conduct R.2.11 (2007). "De minimis" is defined as an "insignificant interest that could not raise a reasonable question regarding the judge's impartiality." *Id.* at "Terminology." Judge Batchelder's husband, like plaintiff Larry Wolpert, is a member of the Ohio Republican Party, they both currently serve as a Representative to the Ohio General Assembly, and both are up for reelection. Representative Batchelder thus unquestionably has "more than a de minimis interest" in the outcome of a proceeding which considers Ohio's voting procedures in a rapidly approaching election.

So I respectfully submit that Judge Batchelder should not have voted in this case, whether or not the Ohio Republican Party's claim actually tugs at her heartstrings. But I find this is all particularly ironic because Judge Griffin has said nothing about this, while he decided to publicly "object" to the panel majority's procedures in his panel dissent. Specifically, he objected to the fact that Judge Moore and Judge Bright, a distinguished member of the Eighth Circuit, "decided to ignore the en banc petition and issue their order" in "violation of the practices of our court." Indeed. The Secretary of State's motion for a stay was properly before the panel when it was filed and panels generally ought to act first rather than defer every significant decision to the possibility that the full en banc court will later decide to hear the case. And whether the panel acted when it did or waited, we would still be in the exact same position we are in now.

But if we are going to talk about what actions create an appearance of impropriety and undermine faith in our democratic system and in the judiciary's independence, then the above speaks for itself. And if we are going to talk about what violates the practices of our court, then I can think of no better example than Judge Griffin's decision to impugn a colleague – *along with a visiting Judge!* – on essentially no basis whatsoever. That said, this is not the first time this sort of thing has happened, so maybe he is right, and that kind of behavior *can* be considered one of the "practices of our court." I dissent.

HELENE N. WHITE, Circuit Judge, dissenting. I am not prepared to challenge the motivations of the parties, the district court, or my colleagues. I dissent because I find the record made in the district court wholly inadequate to support the district court's TRO. In a fraction of the time spent by all in pursuing, opposing and ruling on plaintiffs' petitions, the district court could, and should, have conducted an evidentiary hearing enabling the parties to develop the factual predicates of their arguments. The judges of this court have been forced to opt for one or the other version of the facts, or to defer to the district court's conclusions, without record support.

The affidavits and arguments submitted below are inadequate to establish either that defendant failed to comply with Help America Vote Act (HAVA), or that plaintiffs or the public will suffer irreparable harm unless defendant is compelled to develop a program that enables county election officials to avoid having to access voter verification information by checking a voter it seeks to verify in the database. I note that it appears that the county boards of elections are the entities responsible for entering the new voter registration information in the system in the first place. Nor does the record show that ineligible votes will actually be cast and counted for failure of defendant to create the software ordered by the court.

In sum, notwithstanding the exigencies involved, the court should have put plaintiffs to their proofs. I am aware of no case law that supports that a district court has authority, even in cases of emergency, to forego the development of an adequate factual record and grant relief based upon speculation, or that this court is obliged to defer to that speculation. To the extent the court's decision was based on affidavits, they were insufficient to support the court's conclusions. I am unable to agree with the majority on this record that defendant has failed to comply with HAVA, or that plaintiffs or the public will suffer irreparable harm.

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green

—————————————————————

Clerk
